UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

REID VAN NESS,                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )       No. 3:24-cv-01353
                                        )
TENNESSEE BOARD OF FUNERAL              )
DIRECTORS AND EMBALMERS, et             )
al.,                                    )
                                        )
        Defendants.                     )

## MEMORANDUM OPINION

Before the Court is Plaintiff Reid Van Ness's ("Van Ness") Motion for Preliminary and Permanent Injunction (Doc. No. 58), which has been fully briefed (Doc. Nos. 59, 60, 71, 79, 84), heard at an evidentiary hearing on May 15, 2025 (Doc. No. 78), and is ripe for review.[1]  For the reasons set forth below, Van Ness's motion will be denied.

## I.    FINDINGS OF FACT[2]

Because the Court has already described the pertinent allegations and statutory scheme relevant to the instant case, it need not repeat them here.  (See Doc. No. 62 at 6–8).  Instead, the Court will only describe the factual background to the extent it has been supplemented by evidence or it conflicts with the allegations in the Amended Complaint.  Given that the evidence in the

---

[1] Van Ness categorizes his Motion (Doc. No. 58) as seeking both preliminary and permanent injunctive relief.  (See Doc. No. 59).  However, Van Ness's request for a permanent injunction is premature at this stage of the case.  (See Doc. No. 43 at 1–2 (discovery limited to Van Ness's request for a preliminary injunction)).  Accordingly, the Court will not consider that issue here.

[2] The Court's factual findings come from the credible, persuasive and cogent evidence in the record, as well as the allegations in the Amended Complaint (Doc. No. 36) ("Amended Complaint") that are not contradicted by the record.

record largely contradicts the allegations in the Amended Complaint, the Court's recitation of the factual findings developed during the May 15, 2025 hearing reflects as much.

A.  Background

Van Ness held funeral director and embalmer licenses for decades.  (See Doc. No. 78 at 17:8–18:22).  On March 6, 2020, Van Ness surrendered both licenses (id. at 18:20–22; Doc. No. 70, Ex. 1), claiming he was exempt from the Tennessee Funeral Directors and Embalmers Act ("FDEA") if he did not charge for his services.  (Doc. No. 78 at 21:10–20).  Van Ness never confirmed as much with the Funeral Board.[3]  (Id. at 235:23–236:11 (Executive Director for the Board of Funeral Directors and Embalmers Robert Gribble ("Gribble") stating as much); id. at 180:16–25 (Van Ness testifying to the same)).  After surrendering his licenses, Van Ness alleges that he began holding himself out as a "death doula," the work he bases his claims on.  (See id. at 35:6–36:11; see Doc. No. 36).  Death doulas work with individuals who are near death, as well as their families, to provide emotional and spiritual support.  (Doc. No. 78 at 237:12–23).  According to Gribble, the FDEA does not regulate death doula work.  (Id. at 231:20–22).

Contrary to the allegations, Van Ness did not turn to death doula work after surrendering his licenses.  Instead, Van Ness—without a funeral directing license—continued to provide funeral directing services.[4]  (Id. at 21:10–22, 218:9–16; see id. at 34:23–35:16 (Van Ness testifying that he does not use the title "Death Doula" because it does not fully encompass his work and he needs

---

[3] Like in its May 5, 2025 Memorandum Opinion, the Court will refer to Defendants collectively as the "Funeral Board" herein.

[4] The Court understands the conduct Van Ness engaged in may constitute unlicensed assisting, rather than funeral directing, under the FDEA.  See Tenn. Code Ann. § 62-5-313(a); Tenn. Code Ann. § 62-5-101(6)(A).  The Court refers to the latter only as shorthand and does not opine on what provision of the FDEA Van Ness's conduct may, or may not, fall under.

2

"to show that people can do things without a funeral director")).[5]  It is from this backdrop that the following events unfold.

B.  The June 21, 2022 Letter

On June 21, 2022, Troy Bryant ("Bryant"), associate general counsel for the Tennessee Department of Commerce and Insurance ("TDCI"), sent Van Ness a letter.  (Doc. No. 36-5).  The letter stated:

> The Department would like to make it formally known to you of the passing of Public Chapter No. 1014, effective May 9, 2022.  In part, the Public Chapter redefines the definition of "Unlicensed Assistant" to exclude individuals who formally held a funeral director or embalmer license that was previously revoked, suspended, or voluntarily surrendered with outstanding complaints.
>
> Under Public Chapter No. 1014, you are no longer considered an "Unlicensed Assistant" for the purposes of applicable statutes and rules and any future involvement in the business of funeral directing or embalming, whether under the supervision of Mr. [Shane] Hessey [("Hessey")] or not, will be considered unlicensed activity.[6]
>
> For the sake of clarity, the following are examples that include, but are not limited to, actions that would be considered unlicensed activity if you were to engage in them:
>
> - Speaking or engaging with current or prospective consumers in Tennessee
> - Speaking to medical examiners in Tennessee
> - Meeting with clients to discuss arrangements to be provided in Tennessee
> - Translation services for current or prospective consumers for Tennessee residents
> - Any action relating to providing removal services to Tennessee residents
> - Any action relating to providing funeral services to Tennessee residents
> - Any action relating to providing embalming services to Tennessee residents
> - Any action relating to securing grave spaces or plots to Tennessee residents
>
> If any of the above listed actions, or any others that involve providing funeral directing, embalming, or removal services to any resident of Tennessee, are performed or performed by someone else with your involvement, such actions will

---

[5] Still, Van Ness sometimes uses the term "Death Doula" or "Doula de la Muertes" on statements of goods and services he provides his clients.  (Id. at 40:7–16, 150:21–151:7).

[6] Van Ness alleges that Hessey is a licensed funeral director.  (Doc. No. 36 ¶ 15).

3

be considered unlicensed activity on your behalf.  Following such action, the Department will administratively open a complaint against you regarding unlicensed activity where civil penalties or other disciplinary action may be assessed.

(Id.).

According to the Amended Complaint, upon receipt of this letter, Van Ness became "fearful a sheriff or police officer would arrest and jail him for exercising his free speech," forcing him "to alter his conduct . . . out of fear of being arrested."  (Doc. No. 36 ¶ 25).  His testimony at the hearing directly countered this.  Contrary to his allegations, Van Ness testified that he skimmed Bryant's letter (Doc. No. 78 at 46:5–9), had "no desire to deal with it" (id. at 46:9) and did not think it applied to him (id. 46:15–17).  The rest of Van Ness's testimony confirms Bryant's letter altered Van Ness's funeral directing work little, if at all.  (Id. at 47:4–49:1, 172:11–12 (**Q:** "And [the June 2022] letter didn't change your conduct at all?" **A:** "No. I continued to help people.")).

C.  Van Ness's 2022 and 2023 Work

Throughout 2022 and 2023, Van Ness continued his work operating in the funeral directing space.  For instance, he spoke with family members of decedents about their options; carried and executed price lists for clients; listed services that he will be providing to families; and collected payments from those individuals.  (Doc. No. 70, Ex. 10).  Predictably, the Funeral Board received complaints about such conduct from licensed funeral directors.  (Doc. No. 78 at 218:9–16).

The complaints lodged with the Funeral Board against Van Ness during this time period centered around Van Ness's work with, or on behalf of, Todd County Funeral Home ("TCFH").  As just one example of many, on one occasion, Van Ness aided the family of a decedent in making funeral arrangements.  (Id. at 78:4–7, 79:11–23).  In doing so, Van Ness met the family of the decedent, provided the family with the funeral home's statement of goods and services, assisted the family in selecting their funeral arrangements for purchase, and procured the family's

4

signatures. (Id. at 78:4–7, 79:11–23, 83:1–84:5, 84:17–86:8). Van Ness was the only non-family member present when these negotiations took place. (Id. at 85:21–23). Upon executing this transaction, Van Ness left the original statement with the family, took a copy to the funeral home, and delivered the family's payment to the funeral home. (Id. at 80:9–18, 85:6–17). Van Ness later assisted the funeral home in removing the decedent's body from the family home. (Id. at 81:25–82:1).

### D. The November 14, 2023 Funeral Board Meeting

On November 14, 2023, the Funeral Board conducted a meeting, in part, on Case Nos. 2022021381, 2022044371, 2023029901 and 2023029921 filed against Van Ness for his funeral directing work. (See Doc. No. 70, Ex. 10). Van Ness attended the meeting. (Doc. No. 78 at 62:14–23). The meeting minutes describing the investigation into Van Ness's funeral directing conduct are reflected, in full, in the record. (Doc. No. 70, Ex. 10). Van Ness admits he engaged in all of the conduct described in the Funeral Board minutes. (Doc. No. 78 at 105:1–119:9). During the meeting, the Funeral Board voted to resolve the open complaints against Van Ness by consent order or contested case hearing, and referred the matters to the appropriate district attorney. (Id. at 119:15–19, 176:7–13).

Despite the Funeral Board's vote during the November 14, 2023 meeting, it never drafted or sent a consent order to Van Ness, nor did it open a contested case based on the complaints underlying Case Nos. 2022021381, 2022044371, 2023029901 and 2023029921. (Id. at 176:14–19, 236:19–237:1). Further, the Funeral Board did not attempt to collect any civil penalties from Van Ness arising from the conduct discussed during the November 14, 2023 meeting (id. at 176:7–19), nor was he subject to investigation by the local district attorney. (Id. at 178:9–13, 237:2–4). Instead, on January 15, 2025, the Funeral Board voted to: (1) close all open complaints against

5

Van Ness, and (2) refer them to the local district attorney.  (Id. at 123:16–19).  As of the May 15, 2025 hearing, the complaints against Van Ness are closed with no realistic likelihood of re-opening (id. at 220:17–221:14, 222:9–15), and Van Ness has yet to hear from the local district attorney about any criminal investigation into his unlicensed funeral directing conduct (id. at 125:1–5).

      E.   <u>Van Ness's Current Work</u>

Despite allegations stating the contrary, Van Ness continues to engage in his work with funeral homes and directors.  (Id. at 111:9–12 (Van Ness testifying that if he's "asked to assist [families] in any way, shape or form, [he] tr[ies] to do [his] best to do so")).  For example, he continues to assist funeral homes by providing them with bodies to embalm, helping with the transport of those bodies, providing information to complete death certificates, and delivering payments from decedents' families.  (Id. at 152:16–19, 159:2–4).  In fact, Van Ness has a contract with Cone Funeral Home ("CFH") in Bowling Green, Kentucky, which requires him to pay CFH the charges he presents to families in statements of goods and services for funeral services where CFH is listed as the funeral home provider.  (Id. at 158:16–24).  Further, during the May 15, 2025 hearing, Van Ness confirmed that he performed funeral directing services for four different families earlier this year.  (Id. at 133:11–15, 162:8–21).

The Court need not recount the circumstances of each family Van Ness serviced this year, as a tale of one family's interactions with him suffices to show the conduct Van Ness has been engaging in: the services of decedent Porter Jennings ("Jennings").  Van Ness performed all services in connection with Jennings's funeral in February 2025.  (Id. at 127:2–9, 129:23–25, 260:15–20 (Mr. Jennings's granddaughter, Aphton Wilson ("Wilson") testifying that her family "had a funeral that was performed by Reid Van Ness")).  When meeting with the Jennings family, Van Ness described himself as a death doula, but did not explain what that meant.  (Id. at 262:15–

6

22).  During that meeting, Van Ness gave the Jennings family a statement of goods and services, went over funeral costs, and discussed arrangements.  (Id. at 262:25–263:2).  Van Ness and the family discussed Jennings's casket, colors for the services, and flower arrangements.  (Id. at 263:19–25).  The family also informed Van Ness that they wanted an escort for the services, a hearse, a death certificate, a special pillow, and an obituary.  (Id. at 264:1–9).  Van Ness informed the family that the services would cost $4,518.  (Id. at 264:16–17).  Jennings's widow, Shona Jennings, signed the statement.[7]  (Id. at 269:22–270:8).

According to Wilson's consistent and heartfelt testimony, Jennings's services did not go as planned.[8]  To start, Van Ness did not provide the three separate flower arrangements that Shona Jennings had agreed to pay $300.  (Doc. No. 78 at 269:8–11, 270:9–10).  Instead, he bought two flower bouquets from Publix—for $20 in total—to be used for the services.  (Id. at 268:15–25).  Like the flowers the Jennings family contracted for, they also did not receive the special pillow or the death certificate that were both itemized on the statement of goods.  (Id. at 271:1–6).

But the problems with Van Ness's services did not stop there.  During the funeral services, Van Ness cut off locks of Jennings's hair and distributed it to his children, without prior warning to the family that he would do so.  (Id. at 273:1–17).  Van Ness then, again without asking

---

[7] This statement of goods and services included charges to CFH and TCFH.  Van Ness testified that he received some of that money and distributed a portion as payments to the funeral homes.  (Id. at 152:16–19).

[8] Van Ness does not dispute Wilson's characterization of Jennings's service, but asserts that Shona Jennings asked for the services to be performed in the manner they were.  The Court does not have the benefit of Shona Jennings's testimony before it to evaluate the truthfulness of Van Ness's assertion.  Still, for the reasons described below, see infra, Sections III.A, III.A.n.11, the Court is skeptical of the veracity of Van Ness's testimony on this issue.  In any event, the Court need not resolve this purported discrepancy in the record to rule on the instant motion.  The Court provides the above recitation of events, from Wilson's perspective, to underscore (1) the conduct Van Ness actually engaged in during the relevant period and (2) to further bolster the Court's credibility determinations as to Van Ness.

7

permission from the Jennings family, sought donations to his unnamed organization. (Id. at 273:19–274:11). Further, rather than providing the Jennings family the hearse they contracted for, Van Ness placed Jennings in a Dodge Caravan. (Id. at 271:19–272:13). When the family moved from the services to the cemetery, Van Ness did not provide them with the police escort requested, leading to dangerous conditions for those following the Dodge Caravan in procession to the cemetery. (Id. at 275:3–13).

## II.   LEGAL STANDARD

Pursuant to Rule 65, Van Ness seeks to preliminarily enjoin the Funeral Board from enforcing certain provisions of the FDEA against him until a full hearing on the merits can occur. See University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). If the Court grants Van Ness the relief he seeks, it would "necessarily disrupt the state-law status quo before each side has had full opportunity to make its case[.]" Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct., 769 F.3d 447, 453 (6th Cir. 2014). "That is why preliminary injunctions are 'extraordinary and drastic remed[ies] . . . never awarded as of right[,]'" id. (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)), and why "the plaintiff bears the burden to justify relief, even in First Amendment cases." Id. (citing McNeilly v. Land, 684 F.3d 611, 615 (6th Cir. 2012)).

In considering whether Van Ness's motion should be granted, the Court considers: "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to the opposing party or others; and (4) whether the public interest would be served by the issuance of the injunction.'" Daunt v. Benson, 956 F.3d 396, 406 (6th Cir. 2020) (quoting Bays v. City of Fairborn, 688 F.3d 814, 818–19 (6th Cir. 2012)); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "These factors are not prerequisites but are factors that are to be balanced against each other." Jones v. Caruso, 569 F.3d 258, 265 (6th Cir. 2009).

8

Where material facts relevant to the preliminary injunction are in dispute, the district court may hold an evidentiary hearing.  Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 552–53 (6th Cir. 2007).  From that hearing, the Court "consider[s] carefully the evidence to make factual determinations[,]" and may "ma[k]e credibility determinations to weigh the evidence before it."  Cameron v. Bouchard, 815 F. App'x 978, 988 (6th Cir. 2020).  Although the movant need not offer "irrefutable proof" or "prove his case in full at a preliminary injunction hearing" for injunctive relief to issue, In re DeLorean Motor Co., 755 F.2d 1223, 1230 (6th Cir. 1985) (citation and quotations omitted), the movant mut still make a "clear showing" that the balance of factors weighs in his favor.  Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC, 958 F.3d 532, 539 (6th Cir. 2020) (citation and quotations omitted).

## III.  ANALYSIS

Van Ness requests this Court enter a preliminary injunction "enjoining [the Funeral Board] from enforcing Tennessee's funeral-licensing statutes against him for [h]is pure speech, religious expression, peaceable assembly, freedom of the press, and right to petition his government to seek redress" by being enjoined "from enforcing Tenn. Code Ann. § 62-5-101(13) by threats of excessive civil fines" and "from referring his free speech conduct to the local district attorneys for criminal prosecution [or] imprisonment related to" his First Amendment rights.  (Doc. No. 58 at 5).  He further requests relief "protecting his right to:"

1. Speak and meet with friends and families who are currently in need of help and education related to the topic of death, dying, funeral, visitation and gravesite events.
2. Speak and meet with friends and families who in the future may need help and education related to the topic of death, dying, funeral, visitation and gravesite events.
3. Speak and meet with government officials including medical examiners
4. Meet with friends and families to discuss death, dying, funeral, visitation and gravesite arrangements if they are handling them themselves, through their church, or with a licensed funeral director.

9

5. Speak to friends and families in their native languages and assist them in navigating the acquisition of funeral goods and services for themselves and their religious institutions by providing translation services.

6. Engage in "any action" related to providing removal services, funeral services, embalming services, and/or securing grave spaces or plots as long as Plaintiff does so free of charge and personally "put hands on the body to prepare it for burial."[9]

(Doc. No. 84 at 25).

The Court turns to the first injunctive relief factor, whether Van Ness has a strong likelihood of success on the merits. See Daunt, 956 F.3d at 406. "Where, as here, 'a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor.'" Waskul v. Wastenaw Cnty. Cmty. Mental Health, 900 F.3d 250, 256 n.4 (6th Cir. 2018) (quoting City of Pontiac Retired Emps. Ass'n v. Schimmel, 751 F.3d 427, 430 (6th Cir. 2014) (citations and quotations omitted)). "In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." Obama v. Klayman, 800 F.3d 559, 565 (D.C. Cir. 2015). Given this, the "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that [the] plaintiff has standing." Waskul, 900 F.3d at 256 n.4. In turn, "[a] party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015). It is this burden that the Funeral Board argues Van Ness cannot carry.

---

[9] Van Ness also argues he is "entitled to compensatory damage[s]." (Doc. No. 84 at 24). Not only is this an improper request at this stage of the proceedings, but it also ignores the Court's prior ruling that Van Ness's request for compensatory damages is barred by sovereign immunity. (See Doc. No. 62 at 11).

10

As previously articulated by the Court, "the irreducible constitutional minimum of standing contains three elements." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (citations omitted). Because standing is not merely a pleading requirement "but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561 (citations omitted). Therefore, "where a plaintiff moves for a preliminary injunction," as Van Ness does here, the Court "should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'" Waskul, 900 F.3d at 256 n.3 (quoting Food & Water Watch, 808 F.3d at 912). "[A]n inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction, not dismissal of the case." Food & Water Watch, 808 F.3d at 913; see Memphis A. Philip Randolph Inst. v. Hargett, 978 F.3d 378, 386 (6th Cir. 2020) (same).

The Court starts—and stops—with the first prong of standing, injury in fact. As the Court instructed previously, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 578 U.S. at 339 (quoting Lujan, 504 U.S. at 560). To establish an injury in fact for the injunctive relief Van Ness seeks, he must demonstrate that a "threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur[,]" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (citation and quotations omitted), or that he has suffered a past injury that has "continuing, present adverse effects."

11

Sullivan v. Benningfield, 920 F.3d 401, 408 (6th Cir. 2019). Because Van Ness asserts that he has past, present, and future injuries that support standing, the Court will address each theory in turn.

A. Enforcement (Past and Present Injuries)

"Typically 'an injury' in [the] context [of an alleged constitutional violation] requires that the government enforce the allegedly unconstitutional law against the challenging party before it has standing to sue." Friends of George's, Inc. v. Mulroy, 108 F.4th 431, 435 (6th Cir. 2024). This is what Van Ness, in part, bases his claims on—that the Funeral Board harmed him by enforcing the FDEA against him on November 14, 2023 by fining him $20,000 and referring him for criminal prosecution for his death doula work, resulting in him curtailing his practice. Because the Court had to take those allegations as true at the motion to dismiss stage, it found Van Ness alleged standing for those past and present harms. However, with the benefit of discovery and an evidentiary hearing on the matter, the Court is under no such obligation.

Based on the record before the Court, Van Ness has not made a "substantial" showing that he suffers from past harms from the Funeral Board enforcing the FDEA against him for his death doula work that have had continuing, present adverse effects on him. See Sullivan, 920 F.3d at 408; Food & Water Watch, 808 F.3d at 913. As an initial matter, the majority of the evidence before the Court demonstrates that the subject of the alleged November 14, 2023 Funeral Board enforcement action pertained to Van Ness's funeral directing activities, *not* the death doula work that he relies upon here. This makes sense, as there is no evidence in the record of Van Ness conducting death doula work prior to (or after) the November 14, 2023 Funeral Board meeting. (See generally Doc. No. 78). For instance, there is no credible evidence that Van Ness ever spoke with dying individuals before their passing about their death options, or that he provided emotional or spiritual support for them or their families prior to death. (Id.). Van Ness's own testimony

12

confirms as much, as he testified that he does not use the title "Death Doula" because it does not cover the breadth of his work. (Doc. No. 78 at 34:23–35:16). Instead, Van Ness made clear that he engaged in funeral directing services after surrendering his licenses (id. at 21:10–22), the work specifically addressed by the Funeral Board on November 14, 2023. (See id. at 78:4–7, 79:11–23, 83:1–84:5, 84:17–86:8, 218:9–16). That the Funeral Board's purported enforcement action against Van Ness pertains to different conduct than what he bases his claims on is enough to doom his standing arguments for his purported past and present injuries.

Even considering that a small subset of the work the complaints are based upon may, if read in a vacuum, constitute death doula work, the weight of the evidence before the Court shows that the Funeral Board never even enforced the FDEA against Van Ness. While the Funeral Board held a hearing addressing the complaints raised against Van Ness, and voted to resolve the open complaints against him by consent order or contested case hearing and a referral to the appropriate district attorney, the record reflects that none of those *possible* enforcement actions came to fruition. Indeed, after the November 14, 2023 meeting, the Funeral Board did not draft or send a consent order; did not open a contested case; did not attempt to collect penalties; and did not refer the matters to the appropriate district attorney. (Id. at 176:14–19, 178:9–13, 236:19–237:4). Van Ness concedes this. (Id. at 176:14–19). To make matters worse, on January 15, 2025, the Funeral Board voted to close all complaints against Van Ness, with little (if any) likelihood of reopening. (Id. at 123:16–19, 220:17–221:14, 222:9–15). And, as of the date of the evidentiary hearing, Van Ness had not heard from the local district attorney. (Id. at 125:1–5). On these facts, the Court struggles to find a legally protectable interest of Van Ness's that the Funeral Board invaded through prior enforcement.

13

The flaws in Van Ness's arguments on the injury in fact prong do not end there. Even if Van Ness has made a substantial showing that the Funeral Board enforced the FDEA against him for his death doula work—a premise the Court finds little support for—the record demonstrates that Van Ness's purported injuries are not "continuing" or "present" as required to support the injunctive relief he seeks here. See Sullivan, 920 F.3d at 408. Van Ness testified that he was fearful because of the Funeral Board's conduct, and declined to offer his services to "75 to . . . 175" individuals. (Doc. No. 78 at 196:1–2). However, Van Ness's assertions of chill are not credible, not reliable, and not supported by the weight of the evidence in the record. C.f. Meto v. Gonzales, 192 F. App'x 481, 486–87 (6th Cir. 2006) (affirming immigration judge's determination that conflicting testimony was "not fully credible").

Critically, Van Ness refused to support his assertions of chill with any evidence, despite being given the opportunity to do so in discovery, during his deposition, and at the evidentiary hearing.[10] (Doc. No. 78 at 196:1–199:1; see Doc. No. 70, Exs. 4, 5, 18). For example, Van Ness refused to provide the Funeral Board or the Court with the names of those purportedly lost clients; the dates Van Ness denied them his services; or any other details on the matter. (Id.). To date, Van Ness has not provided the Court this information despite assurances that he would do so. (Doc. No. 78 at 199:10 (Van Ness stating he would "compile [this information] to the best of [his] ability"), 199:16–17 (Van Ness stating that because "[t]he judge has asked" for the information, he'll "be glad to do it")). Because of Van Ness's abject refusal to point to even a *single* individual he did not provide death doula work to because of the Funeral Board's alleged enforcement action, the Court cannot give Van Ness's testimony stating otherwise any weight.

---

[10] It is worth noting that the Funeral Board could have, but chose not to, move to compel the production of this information. The Court considers this in evaluating all of the evidence on this issue.

Indeed, Van Ness's own testimony shows that the November 14, 2023 Funeral Board meeting, and subsequent alleged enforcement action, did little to curtail Van Ness's First Amendment activity. For example, Van Ness testified that: (1)"[i]f [he's] asked to assist [families] in any way, shape or form, [he] tr[ies] to do [his] best to do so" (id. at 111:9–12); (2) he had assisted four families as recently as February 2025 (id. at 133:11–15, 162:8–21); and (3) he had "assisted a family in . . . referring them to a facility" as late as the afternoon prior to the hearing (id. at 126:18–20).[11] He even alluded to the possibility of directing more funerals this year (id. at 162:22–163:1) and maintains a price list and completes statements of goods and services for funerals he handles. (Id. at 150:4–7, 164:22–25). Wilson also confirmed Van Ness has continued his work even after the Funeral Board's November 14, 2023 purported enforcement. See supra, Section I.E.

Van Ness's contradictory, self-serving, and unsupported assertions that he continues to be harmed by the Funeral Board's supposed enforcement of the FDEA against him does not amount to a substantial showing of establishing the first element of standing on his past and present

---

[11] This is just one of many contradictions in Van Ness's testimony. Some other examples include:

- Bryant's June 2022 Letter: Van Ness testified both that he "skimmed it" and "had no desire to deal with it" (Doc. No. 78 at 46:8–9) and that he couldn't "say [he] was without fear" when receiving it (id. at 49:11).
- Notice of the Complaints Addressed at the November 14, 2023 Meeting: Van Ness testified both that he did not know he would be "at issue" during the meeting (id. at 62:18–21) and that he "knew that [he] was under investigation" prior to the meeting (id. at 173:7–11).
- Payments: While Van Ness frequently testified that he has "never charged for the services that" he gives (id. at 21:22), he admitted that he received a Cash App payment of $400 for such work (id. at 157:9–12; see 158:9–11 (no evidence that money was returned to Shona Jennings)).

These inconsistences were further compounded by Van Ness's evasive, and at times combative, nature on the stand. (See, e.g., id. at 138:13–140:14). From these circumstances, it became apparent to the Court that Van Ness at best has a difficult time remembering events that have occurred pertaining to this matter, and at worst is plainly dishonest.

15

injuries. Given that Van Ness is not likely to succeed in establishing the first prong of the standing analysis on these injuries, the Court need not address the others (which merit the same conclusion). See Durham v. Martin, 905 F.3d 432, 434 (6th Cir. 2018) (to establish causation, plaintiff must show "a "causal connection between the injury and the conduct complained of"); Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (to satisfy the last prong of standing, a plaintiff must show that a favorable decision will address their injury). Accordingly, Van Ness's requests for injunctive relief based on his alleged past and present injuries fail. See Food & Water Watch, 808 F.3d at 913.

### B. Pre-Enforcement (Future Injuries)

This leaves Van Ness with one remaining path to the injunctive relief he seeks: he must make a substantial showing that he has standing to bring a pre-enforcement challenge against the Funeral Board. To support a pre-enforcement challenge, Van Ness must establish that the threat of the Funeral Board enforcing the FDEA against him for his death doula work is "imminent," "'real, immediate, and direct.'" Crawford v. U.S. Dep't of Treasury, 868 F.3d 438, 454 (6th Cir. 2017) (quoting Davis v. FEC, 554 U.S. 724, 734 (2008)). This requires Van Ness to show there is a substantial likelihood that he: "(1) [has] an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) that the challenged statute proscribes, and (3) [his] intention generates a 'certainly impending' threat of prosecution[.]" Friends of George's, 108 F.4th at 435; see Driehaus, 573 U.S. at 158. Because the Funeral Board primarily challenges the existence of the third prong of this test, the Court will focus there.

On the third prong, a certainly impending threat of prosecution, the Court has already noted that "a plaintiff need not expose itself to actual arrest or prosecution to bring a pre-enforcement challenge to a statute," but must still subject one's self to more than "subjective chill." Christian

Healthcare Centers, Inc. v. Nessel, 117 F.4th 826, 848 (6th Cir. 2024) (citation and quotations omitted). To evaluate this prong, this Court will re-consider the McKay factors under the appropriate standard, being:

> (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action; and (4) the defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.

Online Merchs. Guild v. Cameron, 995 F.3d 540, 550 (6th Cir. 2021) (quoting McKay v. Federspiel, 823 F.3d 862, 869 (6th Cir. 2016)).

### 1. History of Past Enforcement Against Van Ness or Others

The first McKay factor, history of past enforcement, weighs against finding that Van Ness has standing to bring a pre-enforcement challenge. As an initial matter, there is no evidence in the record on the Funeral Board's enforcement of the FDEA, or lack thereof, on others. On Van Ness, as discussed above, the evidence in the record demonstrates that the Funeral Board has never enforced the FDEA against Van Ness for the death doula work he purportedly seeks to engage in. See supra, Section III.A. Given this absence of evidence in the record, the Court agrees with the Funeral Boad that the threat of enforcement Van Ness contends exists is "chimerical." C.f. Driehaus, 573 U.S. at 164 ("past enforcement against the *same conduct* is good evidence that the threat of enforcement is not chimerical") (emphases added) (citation and quotations omitted).

### 2. Enforcement Warning Letters Sent to Van Ness Regarding Specific Conduct

The second McKay factor, enforcement warnings regarding specific conduct, again weighs against Van Ness. The only possible enforcement warning letter at issue here is the one Bryant sent to Van Ness on June 21, 2022. True, As Van Ness points out, Bryant did testify that at the

17

time he sent this letter, he was "an attorney for the [TDCI] that was appointed to the [F]unreal [B]oard[.]" (See Doc. No. 70, Ex. 19 at 7:11–14). He was also the only attorney assigned to the Funeral Board at that time. (Id. at 7:15–18). On these facts, one could reasonably conclude that the broad language that Bryant used in his June 2022 letter to Van Ness constituted a warning letter that he refrain from his death doula work, or face subsequent Funeral Board action.

But that conclusion only makes sense if the Court ignores other pertinent evidence before it. The evidence also shows that Bryant did not send the June 21, 2022 letter on behalf of the Funeral Board, and had no authority to enforce the FDEA without the Funeral Board's consent. (Doc. No. 78 at 250:3–5 (**Q:** "Is that a letter that was approved by the board?" **A:** "No, sir. No."), 250:23–25 (**Q:** The June 2022 letter "doesn't represent what the board thinks?" **A:** "Correct.")). Indeed, the record reflects that the Funeral Board did not approve of the letter, was not aware of it prior to this litigation, and has never enforced the FDEA against *anyone* based on the warnings in it. (Id. at 250:3–12, 256:14–16). Instead, Bryant sent the June 2022 letter to various individuals to provide them information about the new FDEA provision on unlicensed assistants. (Id. at 250:7–15 (**Q:** "So this was something that Mr. Troy Bryant did to help people be aware of the new public chapter?" **A:** "Yes, sir."), 254:25–255:5). Under these circumstances, Van Ness has not made a substantial showing that Bryant's June 2022 letter was an enforcement letter, or one attributable to the Funeral Board, under McKay.

### 3. Attributes of the FDEA

The third factor, whether there are attributes of the FDEA that make enforcement more or less likely, is neutral. As the Court noted in its May 5, 2025 Memorandum Opinion, the FDEA provides the public with the "authority to file a complaint" against an individual for alleged unlawful funeral directing activity such that enforcement "is not limited to a prosecutor or an

18

agency." <u>Driehaus</u>, 573 U.S. at 164. The open-complaint structure of the FDEA allows "potential complainants [to not be] restricted to state officials who are constrained by explicit guidelines or ethical obligations," creating a risk that those participating in activity falling under the FDEA's purview can more easily have enforcement action taken against them. <u>Id.</u> Gribble confirmed as much during his testimony, as he noted that complaints may be generated "[b]y someone going online and completing a complaint, by snail mail to the [Funeral] [B]oard, by fax to the [Funeral] [B]oard, [and] by email." (Doc. No. 78 at 229:13–17).

Still, the Funeral Board is right that aspects of the review process for complaints lodged pertaining to the FDEA temper the public nature of the reporting scheme. Indeed, not all complaints are presented to the Funeral Board (<u>id.</u> at 231:12–16), the TDCI reviews complaints to determine whether the Funeral Board has jurisdiction over the activity that is reported (<u>id.</u> at 230:10–12, 231:4–10), and the Funeral Board has the discretion to dispose of complaints without even conducting an enforcement hearing (<u>id.</u> at 231:2–3). Importantly, as relevant here, Gribble testified that the Funeral Board has no jurisdiction over death doula work and would not entertain complaints based on such work. (<u>Id.</u> at 231:20–22).

Because the FDEA places safeguards around its enforcement procedures that prohibit the public's complaints from always being addressed on the merits, and there is evidence in the record demonstrating that the Funeral Board does not even enforce the FDEA against death doulas, this factor does little to sway the Court's analysis one way or another.

4. The Funeral Board's Position on Enforcement

Finally, the fourth <u>McKay</u> factor, the Funeral Board's position on enforcement, again weighs against finding that Van Ness has standing for a pre-enforcement challenge. While the Funeral Board has stopped short of stating it would never enforce the FDEA against Van Ness, if

19

appropriate, there is ample evidence in the record demonstrating that it has no plans to enforce it against Van Ness for the death doula activities he bases this action on. (Doc. No. 78 at 231:20–22). Any assertion to the contrary by Van Ness is undermined because the alleged prior enforcement—the Funeral Board's November 14, 2023 actions—pertained to his work in the funeral directing space. See supra, Section III.A. "Accordingly, it is no surprise that [Van Ness] fail[s] to offer any evidence that [his death doula work] has been monitored under the [FDEA], a failure that substantially undermines [his] standing theory." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 411 (2013). On these facts, the record shows that the Funeral Board has little to no interest in enforcing the FDEA against Van Ness if he truly seeks to participate in death doula work.

At bottom, three of the four McKay factors weigh against a finding that enforcement against Van Ness for his death doula work is "certainly impending." Friends of George's, 108 F.4th at 435. Further, Van Ness has failed to substantially show subjective—let alone objective—chill. See supra, Section III.A (Van Ness's own testimony demonstrating he did not experience chill from Funeral Board's actions); see also Christian Healthcare Centers, Inc., 117 F.4th at 848 (plaintiff must show more than subjective chill for pre-enforcement challenge). Given this, Van Ness fails to make the required showing necessary to establish standing for his pre-enforcement claims. See Driehaus, 573 U.S. at 158. Van Ness's "fail[ure] to show a 'substantial likelihood' of standing" mandates that he is "not entitled to a preliminary injunction," making consideration of the other injunctive relief factors unnecessary. Waskul, 900 F.3d at 256 n.4 (citation omitted). Because Van Ness cannot make the threshold showing that he has standing to seek injunctive relief, his motion will be denied.

## IV. CONCLUSION

At the motion to dismiss stage, the Court was required to take Van Ness at his word. Here, with the benefit of discovery and a live evidentiary hearing, it would make little sense to do the same. For the foregoing reasons, Van Ness's Motion for Preliminary Injunction (Doc. No. 58) will be denied.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE